1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   ARTURO GONZALEZ,                          )   Case No.: 1:16-cv-00107 - JLT
                                                )
12                  Plaintiff,                  )   ORDER GRANTING IN PART DEFENDANTS'
                                                )   MOTION FOR SUMMARY JUDGMENT
13          v.                                  )
                                                )   (Doc. 43)
14   CITY OF BAKERSFIELD, et al.,               )
                                                )
15                  Defendants.                 )
                                                )
16   _____        )

17          Arturo Gonzalez asserts that Bakersfield police officers are liable for violations of his civil

18   rights and California law.  (Doc. 17)  Specifically, Plaintiff contends he was subjected to an wrongful

19   detention or arrest, as well as excessive force, in violation of the Fourth Amendment.  (*Id.* at 7-8)  In

20   addition, Plaintiff alleges the defendants are liable for false arrest/imprisonment, battery, negligence,

21   and for violating California's Bane Act.  (*Id.* at 16-19)

22          Defendants seek summary adjudication pursuant to Rule 56 of the Federal Rules of Civil

23   Procedure as to the claims for wrongful detention or arrest under federal law and false arrest under state

24   law.  (Doc. 43 at 2)  Further, Defendants seek summary adjudication of all claims remaining against

25   Defendant Carruesco.  (*Id.*)  Plaintiff opposes the motion, asserting disputes of material facts preclude

26   summary adjudication of his claims.  (Doc. 45)  For the reasons set forth below, Defendants' motion is

27   **GRANTED IN PART**.

28   *///*

## I.  Background and Undisputed Material Facts[1]

"At approximately 1:15 a.m. on January 20, 2015, Bakersfield Police Officers Douglas Barrier, Kasey Knott, Juan Orozco, and Sergeant Gary Carruesco were dispatched to 4800 Chinta Drive in Bakersfield, California to 'check the welfare' of an individual." (DUF 1; Doc. 43-4 at 9-10, Barrier Depo. 29:24-30:5) Barrier explained this means "an individual … appears to need assistance due to some type of either mental disability or physical disability or rambling and so forth." (PUF 1) The Bakersfield Police Department Communication Center notified the officers that the individual who called 9-1-1 was "rambling, not making much sense." (PUF 2)  Further, the offers were informed that the person "made 422 [a criminal threat] to ambush law enforcement past date." (DUF 2; Doc. 43-4 at 13, Barrier Depo. 33:3-9) Officers were informed, "The subject should be identified as Arturo Gonzalez, 4-7-82." (*Id.*)

Barrier looked for information regarding "Arturo Gonzalez" in the system.  (*See* DUF 4)  "Prior to going to the residence, the four officers parked and met at the intersection of Ambrister Drive and Stine Road to form a tactical plan." (DUF 3; Doc. 45-1 at 5)  Barrier told the other officers that Arturo Gonzalez had a warrant for his arrest for a misdemeanor, as well as prior arrests for assault with a deadly weapon and criminal threats.  (DUF 4; Doc. 43-4 at 128, Knott Depo. 41:3-8)  The officers decided "to approach quietly," and that Orozco and Carruesco would be positioned on the south side of the street with Barrier and Knott positioned on the north side.  (PUF 13; Doc. 45-11 at 3, Orozco Depo. 25:7-12)

"The officers proceeded to 4800 Chinta Drive on foot, utilizing vehicles for cover."  (JUF 2) "Upon arrival, Officer Barrier attempted to call the cell phone number associated with the calls that had been made on January 18, 2015; however, no one answered." (JUF 3)  Over the radio, Barrier requested the Communication Center locate a phone number for the residence, contact "the reporting party," Arturo Gonzalez, and have him step outside the home.  (*Id.*; PUF 19-20; Doc. 45-7 at 17, Barrier Depo. 42:14-24)  The Communication Center reached Plaintiff, and the following conversation

---

[1] The parties prepared a joint statement of undisputed facts (Doc. 43-2), from which facts are identified as "JUF." In addition, Defendants filed a separate statement of facts, and Defendants' undisputed facts are identified herein as "DUF." (Doc. 43-3 at 1; *see also* Doc. 45-1).  Likewise, Plaintiff prepared a separate statement of facts (Doc. 45-2), from which undisputed facts are identified as "PUF".

occurred:

> Plaintiff: [Ringing] Hello.
> Dispatcher: Hello, is Arturo there?
> Plaintiff: Arturo who?
> Dispatcher: Arturo Gonzales?
> Plaintiff: Senior? Yes.
> Dispatcher: I'm looking for Junior.
> Plaintiff: No, he's not in right now.
> Dispatcher: He's not in right now?
> Plaintiff: No.
> Dispatcher: Um, is this the address that called police recently, 4800 Chinta Drive?
> Plaintiff: Well, this is Arturo's father. And this is, um, 4800 Chinta Drive.
> Dispatcher: Mmk. Ok. Arturo called us.
> Plaintiff: Yes.
> Dispatcher: And he was stating that – Sir, there are officers outside, and they need somebody to come outside and talk to them.
> Plaintiff: Ok.
> Dispatcher: Can you go outside?
> Plaintiff: I – I can, yes. It's going to be a little bit.
> Dispatcher: All right. I'll let the officer know, ok?
> Plaintiff: Ok, fine.
> Dispatcher: Thank you sir. Bye-bye.
> Plaintiff: Bye.

(PUF 23)  The Communications Center sent an audio transmission to Barrier stating, "I made contact with the subject's father.  He's advising he's not there; however, he will step out and speak with police." (PUF 24)  Barrier testified that by the time the Plaintiff exited the residence, he did not know whether the Communications Center had placed the call to the residence and did not know the results of any communications.[2]  (Doc. 45-7 at 19, Barrier Depo. 44:14-25)

Plaintiff was "wearing baggy clothing, a hooded sweatshirt and a beanie."  (JUF 4)  "Barrier first observed Plaintiff around the threshold of the front door of his residence."  (PUF 26)  Barrier testified that he was shining a flashlight on Plaintiff and, at that moment, "Plaintiff had one hand in a jacket pocket and a phone in the other hand." (PUF 27; Doc. 45-7 at 21- 22, Barrier Depo. 48:6-11, 49:2-12)

The parties present conflicting versions of what occurred after Plaintiff exited his home. Defendants assert the first communication with Plaintiff occurred when Barrier called out, "Bakersfield

---

[2] Barrier does not explain this.  Notably, he was equipped with a mobile radio over which communications with the dispatcher routinely occur. (Doc. 45-7 at 5) Thus, the state of the evidence is ambiguous in that the Court cannot determine whether Barrier is claiming that the dispatcher did not provide the information, that he did not hear the information or that his radio malfunctioned in some manner such to prevent him from actually receiving the transmission.

Police Department, Arturo Gonzalez, take your hands out of your pockets.'" (Doc. 43-4 at 39, Barrier Depo. 73:1-15) Defendants contend that Plaintiff "initially said 'okay' in response to the orders by Officer Barrier but then failed to immediately remove his hands from his pockets." (*See id.* at 39, Barrier Depo. 73:16-74:1; Knott Depo. 68:2-6) Barrier then ordered Plaintiff "to put his hands in the air and walk back towards him." (*Id.* at 43, Barrier Depo. 78:24-79:2) Defendants contend Plaintiff put his hands up and started walking backwards, but kept dropping his arms down and looking over his shoulder. (*Id.* at 44, Barrier Depo. 79:9-19, 80:15-20, 83:11-84:5) Barrier testified that when Plaintiff turned around, raised his hands, and started walking backwards, he was submitting to the officers' authority. (Doc. 43-4 at 47, Barrier Depo. 83:5-22) However, Barrier testified that Plaintiff "lowering his hands down and looking over his shoulder" caused "heightened concern… because it appeared that he was trying to pinpoint [the] location," and that Plaintiff "was preparing for a gunfight." (*Id.*) Likewise, Officer Knott testified that he observed Plaintiff looking back over his right side and perceived the gesture as threatening, because Knott "believed at the time he was trying to pinpoint officer Barrier's location so that he could engage him in a gunfight." (Knott Depo. 69:14-70:5) Officer Barrier reports he gave additional and repeated commands to Plaintiff to raise his arms and face forward. (Doc. 43-4 at 48, Barrier Depo. 84:11-12)

According to Defendants, once Plaintiff reached a well-lit area, Barrier ordered him to stop, keep his hands in the air, and drop to his knees. (Doc. 43-4 at 50, Barrier Depo. 89:1-8) However, Barrier testified that Plaintiff dropped his right hand to his waist area, out of view. (*Id.* at 51*,* 91:3-92-21) Further, the officers assert Barrier yelled, "stop" and he and officer Knott ran toward Plaintiff, with Barrier arriving first. (*Id*., Barrier Depo. 99:5-15) Barrier testified that he used his momentum to push Plaintiff forward onto his stomach. (*Id.* at 59, Barrier Depo. 101:8-20) The officers assert Plaintiff failed to comply with commands to move his arms from underneath his body, and rolled. (*See, e.g. id.* at 6*,* Barrier Depo. 19:24-21:16) During the encounter, Officers Barrier, Knott, and Orozco used force upon Plaintiff, which was witnessed by Carruesco. (*See generally* Doc. 43-4 at 69-70, Carruesco Depo. 13:4-7:25) Plaintiff was then placed in handcuffs. (DUF 19)

On the other hand, Plaintiff asserts he was asked to identify himself when he exited the residence and responded, "This is Arturo Gonzalez Montes, sir." (Doc. 45-5 at 2, Gonzalez Decl. ¶ 3)

4

Plaintiff asserts that when asked to take his hands out of his pockets, he did so and "statements that [he] delayed in taking [his] hands of [the] pockets are not true." (*Id.*, ¶ 4) Plaintiff reports the officers instructed him "to come out to the street, turn around, put [his] ands over [his] head, and start walking backwards; and he "promptly did everything the officers told [him] to do." (*Id.*, ¶ 5) He states that he "did not make any furtive, aggressive, or suspicious movements." (*Id.*) Further, Plaintiff reports he did not drop his hands, and Officer Barrier did not repeatedly tell him to raise them. (*Id.*) Plaintiff acknowledges, "Since I was walking backwards, I may have turned slightly to see where I was going at one point."[3] (*Id.*) Plaintiff asserts that when the officers instructed him to get down on his knees, he did so, and "did not make any suspicious or unusual movements," such as reaching for his waistband. (*Id.*, ¶ 6) He reports that he was not told to keep his hands in the air, and "was simply told to go down on [his] knees." (*Id.*) Plaintiff contends that he "briefly used [his] right hand to touch the ground for balance" as he went down. (*Id.*)

According to Plaintiff, once he was on his knees, no warning was given and no one said "stop." (Doc. 45-4 at 3, Gonzalez Decl. ¶ 7) He reports that the officers struck him in the face and torso, and compressed his back. (*Id.* at ¶ 8) Plaintiff reports he "was not trying to resist" and "[a]ny physical response… was reflexive and involuntary" because he thought he was going to lose consciousness, and was in terrible pain." (*Id.*) He asserts that throughout the encounter, he "was cooperative and compliant." (*Id.*, ¶ 9)

Plaintiff asserts that after the handcuffs were placed on his wrists, he "again told the officers" who he was, but the handcuffs were not removed. (Doc. 45-4 at 3, Gonzalez Decl. ¶ 3) For their part, the officers report that after Plaintiff was in handcuffs, they realized the person in custody was not Arturo Gonzalez, Jr. (*See* Doc. 43-4 at 40, Barrier Depo. 74:2-4) Sergeant Carruesco reported he realized Plaintiff was not the person for whom they were looking "[a]fter he was handcuffed and … whatever he had covering his head was removed" because he observed the grey hair. (*Id.* at 83, Carruesco Depo. 48:3-8) Likewise, Knott testified he realized Plaintiff was older than the person for whom they were looking after Plaintiff was handcuffed and the beanie was removed, and Knott "was

---

[3] Indeed, Plaintiff filed a copy of a video of the incident from a perspective that is different from that of the officers, which shows he repeatedly looked over his shoulder toward the officers.

able to see his face." (Knott Depo. 38:5-15)

At 1:52 a.m., "Sergeant Carruesco dispatched that the 'subject' was in custody." (PUF 100) Plaintiff asserts that after he was handcuffed, "he was put in the back of a patrol car with the handcuffs still on." (PUF 99; Doc. 45-4, Gonzalez Decl. ¶ 10; *see also* Carruesco Depo. 83:3-5 [testifying that Plaintiff was "[a]t some point…placed in the back of a patrol car"]) Carruesco testified that Plaintiff was "detained because [they] didn't know who he was until after the incident was over," and they "needed to determine if he was the person that had made the phone calls and he was the person making the threats." (Carruesco Depo. 66:12-18) Barrier testified he "thought [he] had an obligation to detain him and place him in handcuffs for safety purposes." (Barrier Depo. 106:11-13)

Plaintiff complained "he had pain in his shoulders, left side, and lower back." (JUF 6) An ambulance was summoned at 2:02 a.m., and arrived at 2:09 a.m. (*Id.*) Plaintiff's hands remained in handcuffs until the paramedics arrived, at which point he was handcuffed to the gurney. (Doc. 45-4 at 4, Gonzalez Decl. ¶ 10) He remained handcuffed until he arrived at the hospital. (*Id.*)

Officer Barrier testified he requested to permission to place Plaintiff under arrest, and Sergeant Carruesco denied the request on the scene, saying they "were just going to get him checked out through medical." (Doc. 45-4 at 53, Barrier Depo. 107:12-22, 108:5-7) On the other hand, Sergeant Carruesco testified that neither Barrier nor any other officer made a request for permission to place Plaintiff under arrest. (Doc. 43-4 at 83, Carruesco Depo. 48:9-11, 16-18)

## II.    Evidentiary Objections

Plaintiff filed objections to evidence submitted by Defendants in support of their motion for summary adjudication. (Doc. 45-3) Specifically, Plaintiff objects to evidence regarding the officers' states of mind and to exhibit attached to the declaration of Officer Barrier. (*Id.* at 2)

### A.    Evidence regarding Defendants' states of mind

Plaintiff argues that because "objective standards that apply to Plaintiff's claims in this case, the subjective states of mind of the officers are irrelevant." (Doc. 45-3 at 2) (Fed.R.Evid. 401, 402; *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Bryan v. McPherson*, 630 F.3d 805, 814 (2010)).

The Supreme Court determined that an objective standard applies to claims under the Fourth Amendment, and an action may is reasonable "regardless of the individual officer's state of mind, 'as

long as the circumstances, viewed *objectively*, justify the action.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2010) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978) (emphasis in original)). Consequently, the "subjective motivation is irrelevant." *Id.* (citation omitted); *see also Grahm*, 490 U.S. at 397 ("prior cases make clear" that "the subjective motivations of the individual officers ... ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment"); *Whren v. United States*, 517 U.S. 806, 813 (1996) (holding the reasonableness of a stop does not depend on the subjective intent of the officer, and stating, "subjective intentions play no role in the ordinary, probable-cause Fourth Amendment analysis").

Because the evidence related to the officers' state of mind does not bear on the Court's analysis, the objection to evidence regarding Defendants' states of mind is **SUSTAINED**.

## B.     Admissibility of "Exhibit A"

Officer Barrier attached a document he identified as "Police Document Report No. 2015-14237" to his declaration in support of summary adjudication. (Doc. 43-5) In doing so, Barrier stated only: "Attached hereto as Exhibit A is a true and correct copy of Bakersfield Police Department Report No. 2015-14237 which I accessed prior to my arrival at the subject Chinta Drive address. (*Id.* at 1, ¶ 2)

Plaintiff objects to the exhibit "as multiple hearsay." (Doc. 45-3 at 2) Plaintiff observes: "First, the document incorporates the unsworn out-of-court statements of an unknown 9-1-1 caller. Second, the document incorporates the unsworn out-of-court statements of the officer who prepared the report." (*Id.* at 2-3, citing Fed. R. Evid. 801) In addition, "to the extent the officer who authored the report is summarizing the contents of an audio recording not in evidence, Plaintiff objects on the grounds of the Best Evidence Rule." (*Id.* at 3, citing Fed. R. Evid. 1002)

Pursuant to Rule 56(c) of the Federal Rules of the Civil Procedure, "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that *would be admissible in evidence*, and show that the affiant or declarant is competent to testify on the matters stated." (emphasis added) For a document to be admissible, it must be "authenticated through personal knowledge … and the affiant must be a competent 'witness who wrote [the document], signed it, used it, or saw others do so.'" *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011) (quoting *Orr v. Bank of America*, 285 F.3d 764, 773-74 & n.8 (2002).

Here, Officer Barrier does not assert that he wrote the document or saw others do so. Nevertheless, the Court may consider the police report and the statements contained therein not for the truth of the matters stated therein but merely to demonstrate what a reasonably well-trained officer on the scene knew. Accordingly, though Plaintiff's hearsay objection is well-taken, the information known to the officers is relevant to the considerations and it will be considered.

### C. Conclusion

To the extent that statements offered by either party are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis. *Burch v. Regents of the Univ. of Cal.*, 433 F.Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context") (citation omitted, emphasis in original). Rather, the Court's analysis relies on evidence only that it has deemed admissible.

### III.    Request for Judicial Notice

Defendants request that the Court take judicial notice of Plaintiff's First Amended Complaint and Defendants' Answer to the First Amended Complaint. (Doc. 43-6 at 1) The Court may take judicial notice of its own files and of documents filed in other courts. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). However, the Court need not take judicial notice of prior filings submitted in the same case. *See, e.g., Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.,* 935 F. Supp. 2d 968, 979 (E.D. Cal. 2013) (finding it unnecessary to take judicial notice of a prior order in the same case); *Ortega v. Univ. of the Pac.*, 2013 WL 6054447, at *3 (E.D. Cal. Nov. 15, 2013) (finding it unnecessary to take judicial notice of a complaint filed in the same case). Therefore, the request for judicial notice is **DENIED**.

### IV.    Legal Standards for Summary Adjudication

Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .")

8

(internal quotation marks and citation omitted). The purpose of summary adjudication "is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Summary adjudication is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary adjudication should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c). The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

*T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary adjudication, the Court can only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## V.  Discussion and Analysis

Defendants seek summary adjudication of the First Claim for Relief (of unlawful detainment or arrest in violation of the Fourth Amendment), Seventh Claim for Relief (for false arrest/imprisonment in violation of California law), and all remaining claims against Defendant Carruesco. (Doc. 43 at 2)

### A.  First Claim for Relief: Violations of the Fourth Amendment

#### 1.  Section 1983

Plaintiff alleges the officers are liable for an unlawful detention and arrest in violation of the Fourth Amendment. (Doc. 17 at 7) He brings the claim pursuant to 42 U.S.C. § 1983, which "provides a method for vindicating federal rights elsewhere conferred." *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012). In pertinent part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) a constitutional right was deprived, and (2) a person who committed the violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must identify a specific injury he suffered, and show causal relationship between the

defendant's conduct and the injury suffered. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). Thus, Section 1983 "requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff." *Chavira v. Ruth*, 2012 WL 1328636 at *2 (E.D. Cal. Apr. 17, 2012). An individual deprives another of a federal right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). In other words, "[s]ome culpable action or in action must be attributable to defendants." *See Puckett v. Corcoran Prison - CDCR*, 2012 WL 1292573, at *2 (E.D. Cal. Apr. 13, 2012). Here, Plaintiff alleged the Bakersfield police officers violated Fourth Amendment "right to be secure in his person against unreasonable searches and seizures." (*See* Doc. 17 at 7, ¶¶ 35-36)

2.      Fourth Amendment

The Fourth Amendment provides: "The right of the people to be secure in their persons... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." *U.S. Constitution, amend. IV*. Plaintiff contends the officers violated his right by detaining him "without reasonable suspicion and [arresting] him without probable cause." (Doc. 17 at 7, ¶¶ 35-36)

a.      Seizure

As a threshold matter, the Court must determine whether Plaintiff was "seized" within the meaning of the Fourth Amendment, and if so, the extent of the seizure. If no seizure occurred, the officers' conduct plainly did not violate his Fourth Amendment right to protection from "unreasonable searches and seizures." *U.S. Const. amend. IV*.

A person is seized when an officer, "by means of physical force or show of authority, terminates or restrains his freedom of movement," *Brendlin v. California*, 551 U.S. 249, 254 (2007), such that "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The Supreme Court explained the "crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"

*Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

It is undisputed that the conduct of the officers communicated to Plaintiff that he was not free to ignore the police presence. Thus, there was a "seizure" within the meaning of the Fourth Amendment. However, the parties disagree regarding the extent of the seizure. Defendants argue Plaintiff was not taken under arrest, and that the officers executed a lawful investigatory stop. (*See generally* Doc. 43-1 at 13-17) On the other hand, Plaintiff argues the seizure exceed an investigatory stop, and contends factual disputes preclude summary adjudication of the claim. (*See generally* Doc. 45 at 13-19)

### b. Investigatory stop or arrest

Law enforcement officers may initiate an investigatory stop of a citizen if they have reasonable suspicion that a person is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). The reasonable suspicion standard "'is a less demanding standard than probable cause,' and merely requires 'a minimal level of objective justification.'" *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). To constitute reasonable suspicion, the officer's belief that "criminal activity is afoot" must be supported by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* at 21, 30; *see also Navarette v. California,* 134 S. Ct. 1683, 1687 (2014) (an officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity").

As the Ninth Circuit explained, "There is . . . no bright line rule for determining when an investigatory stop crosses the line and becomes an arrest." *Allen*, 66 F.3d at 1056 (internal quotations, citation omitted). "The totality of the circumstances determines whether and when an investigatory stop becomes an arrest." *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2013) (citation omitted). In determining whether the "totality of the circumstances" indicate police effectuated an arrest or a detention, courts are to "consider both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996) (internal quotations and citations omitted). Thus, the Court must evaluate "not only how intrusive the stop was, but whether the

12

methods used were reasonable given the specific circumstances." *Id.*

### i. Intrusiveness of the stop

This factor requires the Court to "review the situation from the perspective of the person seized." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295-96 (9th Cir.1988). "A seizure becomes unlawful when it is 'more intrusive than necessary.'" *Ganwich v. Knapp*, 319 F.3d 1115, 1122 (9th Cir. 2003) (quoting *Florida*, 460 U.S. at 504). Factors the Court may consider to evaluate the intrusiveness of a stop include the length of the stop, whether weapons were drawn, physical restriction of a suspect, the use of handcuffs, the number of police officers present, and whether an individual is transported in any manner during the stop. *See Washington*, 98 F.3d at 1189-90. Significantly, "if the police draw their guns it greatly increases the seriousness of the stop." *Washington*, 98 F.3d at 1188. Likewise, the use of handcuffs "substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).

Plaintiff contends he was compliant with the orders given, did not make suspicious movements, and did not resist the officers. (Doc. 45-5 at 2, Gonzalez Decl. ¶¶ 4-6) However, each of the officers testified that they had their weapons drawn when executing the investigatory stop. (Doc. 43-4 at 21, Barrier Depo. 42:11-13 [stating he drew his weapon when he saw Plaintiff]; Knott Depo. 85: 9-22 [testifying he had his firearm drawn and pointed in the direction of Plaintiff to provide "[l]ethal coverage"]; Orozco Depo. 24:12-17; Carruesco Depo. 60:5-61:1) Plaintiff was physically restrained and placed in handcuffs. (*See* DUF 19; PUF 50, 79) While handcuffed, Plaintiff was placed in a police vehicle, and once paramedics arrived to treat him, was handcuffed to the gurney. These facts weigh in favor of finding that the investigatory stop was more intrusive than necessary, and was transformed into an arrest. *See Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016) ("any reasonable juror would be compelled to find an arrest where the officers ordered the two plaintiffs from a car, shone a spotlight on them, drew their weapons, handcuffed them, and then placed them in separate police cars") (emphasis omitted, citing *Washington*, 98 F.3d at 1184, 1192).

### ii. Justification of the actions

In examining the reasons for the actions taken, the Court must undertake the inquiry "from the

perspective of law enforcement," while bearing in mind that "the purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence." *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir.2009) (internal quotation marks, citation omitted). To determine "whether the use of intrusive techniques turns a stop into an arrest," the Court must determine whether the police conduct was reasonable. *Washington*, 98 F.3d at 1189. The Ninth Circuit explained,

> [W] have only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as 1) the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) the police have information that the suspect is currently armed; 3) the stop closely follows a violent crime; and 4) the police have information that a crime that may involve violence is about to occur.

*Id.*, (footnotes, citations omitted). In addition, the Court may "consider the specificity of the information that leads the officers to suspect that the individuals they intend to question are the actual suspects being sought." *Id.*

Officers may "take the steps necessary to protect themselves when they have adequate reason to believe that stopping and questioning the suspect will pose particular risks to their safety." *Washington*, 98 F.3d at 1186. As a result, "pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not automatically convert an investigatory stop into an arrest that requires probable cause." *Id.* (citing *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990); *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995)). For example, in *Gallegos v. City of Los Angeles*, the defendant was mistaken for a suspect who had reportedly tried to break into a house. *Id.*, 308 F.3d 987, 990-92 (9th Cir. 2002). The police stopped the defendant in his truck, ordered him from the truck at gunpoint, handcuffed him, and placed him in a police car for transportation to determine whether he was the individual for whom they were looking. *Id.* Even so, *Gallegos* held that "[t]he detention was brief, calculated solely to make sure [the police] had the right man," and that under those circumstances, the police had conducted an objectively reasonable investigatory stop. *Id.* at 992-93.

Defendants were dispatched to the residence to "check the welfare" of an individual named Arturo Gonzalez, who was a 33-year-old male with long black hair. (DUF 1, 2; Barrier Depo. 227:23-228:1) The officers were informed that Arturo Gonzalez made a threat "to ambush law enforcement [on a] past date." (DUF 2; Barrier Depo. 33:3-9) Officer Barrier ran a records check, and found Arturo

Gonzalez had a history of being arrested for assault with a deadly weapon and criminal threats, and "made prior threats against law enforcement, threatening to ambush" the police (Doc. 43-4 at 31-32, Barrier Depo. 56:22-57:2)  In addition, after reviewing the reports Officer Barrier was concerned Plaintiff was "not of sane mind" and was "potentially armed with a shotgun" "[o]r another type of firearm."  (Barrier Depo. 38:17-19, 54:1-2)  Officer Barrier considered Plaintiff to be a "violent subject."  (*Id.*, 57:2)  Accordingly, safety was a reasonable concern when the officers arrived at the residence to which they were dispatched.  This justified the officers ordering Plaintiff to hold his hands up and to walk backward toward them in order to keep him at a disadvantage until the officers' safety was assured.

Significantly, however, there are factual disputes regarding the encounter between Plaintiff and the officers.  When Plaintiff exited the residence, Officer Barrier was shining a flashlight on Plaintiff, and could see him clearly enough to observe that "Plaintiff had one hand in a jacket pocket and a phone in the other hand."  (PUF 27; Barrier Depo. 48:6-11, 49:2-12)  Plaintiff contends that he was over sixty years old at the time and had a grey beard—giving him physical characteristics that distinguished him from his 33-year-old son who had long black hair.  (*See* Doc. 45 at 17)  This further supports that the officers had reason to know that he was not the person they sought.[4]

In addition, Plaintiff reports he acted in compliance with all commands given by the officers— including taking his hands out of his pockets, walking to the street, turning around raising his hands, walking backwards, and getting on the ground— and that he did not make any suspicious or aggressive movements.  (Doc. 45-4, Gonzalez Decl. ¶¶ 4-6)  Further, Plaintiff asserted that once he was on the ground, he "was not trying to resist," but instead "was cooperative and compliant" through the encounter.  (*Id.*, ¶¶ 8-9)  Thus, construing the evidence in the light most favorable to Plaintiff, he did not offer any reason for the officers to find him uncooperative or take actions that indicated the officers should continue to be concerned for their safety.

The Ninth Circuit reviewed similar circumstances in *United States v. Del Vizo*, 918 F.2d 821,

---

[4] Indeed, as soon as the officers saw his face, they understood they had the wrong man.  Though they seem to say that this was after he was in handcuffs, it is not clear why they could not had known this from the first instance that he began to move toward them—face first—before they instructed him to walk toward them backwards. (Doc. 45-7 at 32 ["Arturo Gonzalez looked towards [Barrier] and said, "Okay."]

824-25 (9th Cir. 1990), and determined that an investigatory stop "ripened into an arrest" where the suspect was held at gunpoint, ordered to lie on the street, and handcuffed because "[t]here was no evidence that Del Vizo failed to comply with police orders." *Id.* The Ninth Circuit explained that "an investigatory stop will not be converted into an arrest simply when the officers take reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed." *Id.* at 825 (internal quotation marks, citation omitted). However, absent evidence that the person "failed to comply with police orders," and the police did not identify "an investigatory justification for the degree of the[] restraints," the Court had "little difficulty" in finding the stop became an arrest. *Id.* Likewise, here, the facts in the manner most favorable to Plaintiff demonstrate compliance with the orders, yet all the officers held him at gunpoint, and Plaintiff was instructed to get on the ground, then placed in handcuffs.

Moreover, Plaintiff remained handcuffed and detained after the officers realized he was not the person for whom they were looking. Sergeant Carruesco reported he realized Plaintiff was not the person for whom they were looking "[a]fter he was handcuffed and … whatever he had covering his head was removed" because he observed the grey hair. (Carruesco Depo. 48:3-8) Likewise, Knott testified he realized Plaintiff was older than the person for whom they were looking after Plaintiff and Knott "was able to see his face." (Knott Depo. 38:5-15) As explained by the Supreme Court, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). When a detention exceeds the scope of a permissible *Terry* stop and is something more than "a brief stop, interrogation, and under the proper circumstances, a brief check for weapons," it has become a *de facto* arrest that requires probable cause. *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001). Here, at least as of now, Defendants fail to identify any "particularized and objective basis for suspecting" *Plaintiff* of criminal activity, and a reason to continue the detention.[5] *See Navarette,* 134 S. Ct. at 1687; *Miles*, 247 F.3d at 1012.

---

[5] Defendants assert that Officer Barrier "accessed information about prior calls for service at the Chinta Drive address[,] including the fact that on January 18, 2015, Arturo Gonzalez made multiple calls saying things like "I got my shotgun and I'm gonna kill the cops!", that he was in possession of a 12 gauge shotgun and if Officers arrive at his residence, he will "be hiding in the dark to ambush" responding Officers, that he was in possession of a grenade, a rocket launcher, five friends and an AK-47." (Doc. 43-1 at 7) Defendants contend that the threat that Arturo Gonzalez "and his friends" would ambush officers is further support for the reasonableness of the actions by the officers. (*See* Doc. 43-1 at 18)

### iii.    Conclusion

The Court concludes that a reasonable jury could find that the extended detention of Plaintiff, including the use of force, handcuffs, and placement in the police vehicle, exceeded the limits of an investigative stop because the facts—as taken in the light most favorable to Plaintiff—do not show he posed an immediate threat to officer safety and the police did not have any specific information that a crime was about to occur or had occurred. *See Washington*, 98 F.3d at 1187.

Given the significant factual disputes regarding the encounter, including whether, and to what extent, Plaintiff complied with the officers' orders and officer safety was a concern, the Court finds Plaintiff carries his burden to identify triable issues of fact, and a fact-finder must "resolve the parties' differing versions of the truth." *See T.W. Electrical Serv., Inc.,* 809 F.2d at 630; *see also Aquino v. County of Montery Sheriff's Dep't*, 2016 U.S. Dist. LEXIS 136150 at *18, 20 (N.D. Cal. Sept. 29, 2016) (where the plaintiff was "put in handcuffs [and] subjected to significant physical force in the process, including being taken to the ground, and then restrained for some time in the back of the patrol car," yet there were conflicting evidence regarding the plaintiff's level of cooperation and resistance, there was a triable issue as to whether the officer's "tactics exceeded what was necessary or reasonable under the circumstances").

### 3.    Qualified Immunity

Defendants contend they are entitled to qualified immunity, which protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

---

However, the Court has reviewed the entirety of the deposition transcripts for each officer, and not one of the defendants indicated there was a concern that Arturo Gonzalez had "five friends" who would attack, a grenade, rocket launcher, or an AK-47. Instead, the only concern was that the caller *previously* made threats against the police. *See* Barrier Depo. 58: 11-15 (describing the tactical plan to call the responding party out to "ensure that there was no firearm and [the officers] were safe," and "then to check his welfare"). When coupled with the evidence from the dispatcher that Barrier was advised that the plaintiff was not present in the home, the suggestion that Defendants were reasonably concerned Plaintiff may have been one of the "five friends" mentioned in the 9-1-1 call is not well-taken.

17

The threshold inquiry to a qualified immunity determination is whether the facts alleged, when taken in the light most favorable to the plaintiff, demonstrate that the official's conduct violated a statutory or constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the alleged conduct would not be considered a violation, the inquiry stops and the defense of qualified immunity applies. *See id.* However, if a constitutional violation occurred, the Court must next determine whether the statutory or constitutional right was "clearly established." *Id.* Defendants have the burden to prove they are entitled to qualified immunity. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir.2005).

### a. Whether a constitutional violation occurred

Plaintiff's version of the encounter with the officers supports a conclusion that the investigatory stop ripened into an arrest, and the defendants lacked probable cause for that arrest. Accordingly, for purposes of summary judgment, the facts demonstrate a violation of Plaintiff's right to be free from an unlawful seizure.

### b. Whether the right was "clearly established"

A right is "clearly established" in the context of qualified immunity if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted' . . . or whether the state of the law [at the time of the violation] gave 'fair warning' to the official[] that [his] conduct was unconstitutional." *Clement v. Gomez*, 298 F.3d 898, 906 (2002) (quoting *Saucier,* 533 U.S. at 202). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The right to be free from an unlawful detention or arrest was clearly established prior to the encounter between Plaintiff and the defendant officers. The Supreme Court determined that an investigatory stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida*, 460 U.S. at 500. In addition, "courts have long recognized that an investigative detention may, at some point, become so overly intrusive that it can no longer be characterized as a minimal intrusion designed to conform quickly or dispel the suspicions which justified the initial stop."

United States v. Sharpe, 470 U.S. 675, 683-86 (1985); *see also Dunaway v. New York,* 442 U.S. 200, 212, (1979) ("When the detention exceeds the boundaries of a permissible investigative stop, the detention becomes a de facto arrest requiring probable cause").  Triable issues of fact here preclude a grant of qualified immunity because, with Plaintiff's version of the facts, it would be clear to a reasonable officer that it is not justified to execute an investigatory stop, and to allow the detention to become an arrest without probable cause.  *See id.* Accordingly, qualified immunity is not warranted at this time.  *See also Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (premature to find qualified immunity where there remained unresolved issues of fact regarding whether officers violated the plaintiff's Fourth Amendment rights and whether the officers' belief in the legality of their actions was reasonable).

Consequently, Defendants' motion for summary judgment on Plaintiff's claim for a violation of his right to be free from an unlawful seizure is **DENIED**.

**B.     Seventh Claim for Relief: False Arrest/Imprisonment under California Law**[6]

False imprisonment is defined by statute as "the unlawful violation of the personal liberty of another." Cal. Pen. Code. § 236. The tort is defined similarly and consists of the "nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." *Molko v. Holy Spirit Assoc.*, 46 Cal.3d 1092, 1123 (1988). "The only mental state required to be shown for false imprisonment is the intent to confine, or to create a similar intrusion." *Fermino v. FedCo. Inc.*, 7 Cal.4th 701, 716 (1994).  There is no liability for an officer "acting within the scope of his or her authority, for false arrest or false imprisonment arising out of any arrest" when (1) the arrest was lawful, or the officer had reasonable cause to believe the arrest was lawful at the time of the arrest, or (2) the arrest was made pursuant to a charge made, upon reasonable cause, of the commission of a felony by the person to be arrested. Cal. Pen. Code. § 847.

As discussed above, there are significant conflicts of facts relating to the encounter between Plaintiff and the defendants, which preclude a determination, at this time, that the arrest was lawful or

---

[6] Under California law, false arrest is not a separate tort, but a subcategory of false imprisonment. *Watts v. Cty. of Sacramento*, 256 F.3d 886, 891 (9th Cir. 2001) (citation omitted); *see also Collins v. San Francisco*, 50 Cal. App. 3d 671, 673 (1975) ("false arrest is but one way of committing false imprisonment").

that the officers had reason to believe the arrest was lawful.  Consequently, Defendants' motion for summary adjudication of this claim is **DENIED**.

## C. Liability of Defendant Carruesco

Defendants seek summary adjudication of claims remaining against Sergeant Carruesco, which include Plaintiff's Second, Eighth, and Ninth Claims for relief.  (*See* Docs. 17, 28-29 and 41)

### 1. Second Claim for Relief: Excessive force

It is undisputed that Officers Barrier, Knott, and Orozco used force upon Plaintiff, which was witnessed by Carruesco, who did not touch Plaintiff. (*See* Doc. 45-1 at 17; Carruesco Depo. 13:4-8) Plaintiff contends Carruesco is liable for a violation of the Fourth Amendment for excessive force for his failure to intervene.  (*See* Doc. 17 at 8, ¶ 47; Doc. 45 at 24)  Defendants argue this claim fails because "there was no participation by Defendant Carruesco, nor was there a meaningful opportunity to intervene."  (Doc. 43-1 at 22)

#### a. Failure to intervene

The failure to intervene can support an excessive force claim where bystander officers have an opportunity to intervene, but fail to do so.  *Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003); *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) ("police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen").  Importantly, "officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham*, 299 F3d at 1289-90 (citing *Bruner v. Dunaway*, 684 F.2d 422, 426-27 (6th Cir. 1982) [holding that officers who were not present at the time of the alleged assault could not be held liable in a Section 1983 action]; *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990) [granting the officers' motion for summary judgment because the officers had no "realistic opportunity" to prevent the attack committed]).

Defendants contend "there was no realistic opportunity for Defendant Carruesco to intercede" because "[e]verything happened very quickly."  (Doc. 43-1 at 24)  According to Defendants, because Carruesco was positioned across the street, he "had no meaningful opportunity to intervene during this rapidly evolving situation."  (*Id.* at 25)  Defendants contend Carruesco "essentially arrived at the scene after everything had occurred."  (*Id.*)

On the other hand, Plaintiff contends Carruesco had an opportunity to intervene, because "full two to three minutes passed from the time Defendant Barrier tackled Plaintiff to the time Plaintiff was in handcuffs." (Doc. 45 at 25, citing Barrier Depo. 103:7-10 and Surveillance Video at 4:58-8:48). Indeed, it is undisputed that Orozco and Carruesco were positioned together on the south side of the street, with Barrier and Knott positioned on the north side. (PUF 13; Doc. 45-11 at 3, Orozco Depo. 25:7-12). It is also undisputed that the physical altercation between Plaintiff and the officers was long enough for Orozco to cross the street and exert force upon Plaintiff. (*See id.* at 4-5, Orzco. Depo. 28:6-8, 30:2-8) Considering the close proximity of the officers, if Orozco had the time to cross the street and *join* in the altercation, it follows that Carruesco may have had the time to cross the street to *intervene* in the actions of the officers.

The Ninth Circuit addressed a similar situation in *Lolli v. County of Orange*, and reversed the district court's decision to grant summary judgment for a supervisory officer where plaintiff's claim was based upon "failure to intervene in the assault." *Id.*, 351 F.3d at 418. The supervisory officer was present during the encounter and "admitted that he observed the deputies struggling with Lolli, but he did not become involved or give orders." *Id.* Likewise, here, Sergeant Carruesco observed the officers' interaction with Plaintiff and had sufficient time to intervene. Therefore, as Plaintiff argues, "a jury could conclude that there was plenty of time for Carruesco to give an instruction to the other officers to stop."[7] (*See* Doc. 45 at 25)

### b.    Qualified immunity

Defendant contends that, in the alternative, "Carruesco is entitled to qualified immunity because there is a complete absence of authority that the minimal involvement by Gary Carruesco is sufficient to constitute either the integral participation or failure to intervene theory." (Doc. 43-1 at 25) However, under Plaintiff's version of the facts, Carruesco had the opportunity to cross the street and intervene in the actions of the other officers, and the obligation to intervene to prevent unlawful actions of other officers is "clearly established" law. *See Lolli*, 351 F.3d at 418; *Motley v. Parks*, 383 F.3d 1058, 1071 (9th Cir. 2004) (officers who failed to intervene and stop unlawful actions of other officers were not

---

[7] Because the Court finds Defendants fail to demonstrate that Plaintiff cannot proceed with the "failure to intervene" theory, it does not address the "integral participation" theory of the claim.

entitled to qualified immunity). No reasonable officer could believe that use of force without justification and failing to intervene during the use of such force is lawful. Accordingly, Carruesco is not entitled to qualified immunity for the excessive force claim and his motion for summary adjudication of the Seventh Claim for Relief is **DENIED**.

### 2. Eighth Claim for Relief: Battery

In responding to Defendants' motion, Plaintiff indicates he "agrees to withdraw the battery claim against Defendant Carruesco under California law." (Doc. 45 at 26) Accordingly, Defendants' motion for summary adjudication of the Eighth Claim for Relief is **GRANTED**.

### 3. Ninth Claim for Relief: Negligence

Under California law, "[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." *McGarry v. Sax*, 158 Cal. App. 4th 983, 994 (2008) (quotations omitted). "Absent a special relationship creating a special duty, the police have no legal duty to control the conduct of others." *Adams v. City of Fremont*, 68 Cal.App.4th 243, 277 (1998). "Generally, there is no legal 'duty,' and hence no liability for negligence, unless there is a special relationship between the police and either the victim or the third person which gives rise to a responsibility to control the third person's conduct." *Lopez v. City of San Diego*, 190 Cal.App.3d 678, 680,(1987).

In seeking summary adjudication of this claim, Defendants contend they have not located any case authority that holds an officer liable for the claims under a "failure to intervene" theory. (*See* Doc. 43-1 at 26) Indeed, the Court has located none. "Generally, there is no legal 'duty,' and hence no liability for negligence, unless there is a special relationship between the police and either the victim or the third person which gives rise to a responsibility to control the third person's conduct." *Lopez v. City of San Diego*, 190 Cal. App.3d 678, 680 (1987). Here, Plaintiff fails to identify the specific legal duty owed to him, or the existence of a special relationship that would impose a duty to intervene upon Carruesco under California law. *See Celotex,* 477 U.S. at 323 Consequently, Carruesco's motion for summary adjudication of the Ninth Claim for Relief is **GRANTED**.

22

## VI.    Conclusion and Order

Based upon the foregoing, the Court **ORDERS**: Defendants' motion for summary adjudication (Doc. 43) is granted in part and denied in part as follows:

1.    Summary adjudication of the First and Seventh Claims for Relief, for unlawful arrest in violation of federal law and false arrest in violation of California law, is **DENIED**;

2.    Summary adjudication of the Second Claim for Relief, for failure to intervene against Defendant Carruesco, is **DENIED**; and

3.    Summary adjudication of the Eighth and Ninth Claims for relief, for battery and negligence, as to Defendant Carruesco only, is **GRANTED**.

IT IS SO ORDERED.

Dated:   **June 5, 2017**                          **/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE