1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

ARTURO GONZALEZ,

        Plaintiff,

        v.

CITY OF BAKERSFIELD, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:16-cv-00107 – JLT

PRETRIAL ORDER

Deadlines:

Motions in Limine Filing: 7/2817
Oppositions to Motions in Limine: 8/4/17
Hearing on Motions in Limine: 8/14/17
Trial Submissions: 8/11/17

Jury trial:  8/21/2017 at 8:30 a.m., 4-5 days estimate

        Arturo Gonzalez asserts that Bakersfield police officers are liable for violations of his civil rights and California law, including wrongful detention or arrest, excessive force, battery, negligence, and for violating California's Bane Act.  Defendants contend the actions taken were lawful and did not violate Plaintiff's civil rights.

**A.     JURISDICTION/ VENUE**

        This action includes causes of action pursuant to 42 U.S.C § 1983, and jurisdiction is based upon 28U.S.C §§ 1331 and 1343.  In addition, the events that gave rise to this action occurred in Bakersfield, California.  Accordingly, venue is proper in the United States District Court for the Eastern District of California sitting in Bakersfield.  *See* 28 U.S.C. § 1391.

**B.     JURY TRIAL**

        The parties demanded a jury trial in this matter.  (Doc. 1 at 21; Doc. 8 at 12)

## C.    UNDISPUTED FACTS

1.    Plaintiff's claims arise out of an incident that took place in the City of Bakersfield, State of California, and within this judicial district.

2.    Plaintiff is suing in his individual capacity and seeks damages.

3.    The Defendant Officers were acting under color of law within the course and scope of their duties as officers for the City of Bakersfield.

## D.    DISPUTED FACTS

All other facts in this case remain in dispute including but not limited to:

1.    Whether the seizure of Plaintiff constituted a detention or an arrest;

2.    Whether, as either a detention or an arrest, the seizure of Plaintiff was justified;

3.    Whether Defendants Barrier, Knott, and/or Orozco used excessive or unreasonable force;

4.    Whether Defendant Barrier, Knott, and/or Orozco were negligent;

5.    Whether each of the Defendants integrally participated in or failed to intervene in the wrongful conduct of the others;

6.    The nature and extent of Plaintiff's damages, including economic and non-economic damages, both past and future;

7.    Whether punitive damages should be imposed and, if so, the amount;

8.    Whether a statutory penalty should be imposed under the Bane Act;

9.    Whether the Defendant Officers met to form a tactical plan regarding their check the welfare of Arturo Gonzalez Jr.;

10.    Whether the plaintiff came outside and followed Officer instructions regarding walking backwards, keeping his hands over his head, getting on his knees, etc.

11.    Whether the Defendant Officers knew that Plaintiff was not Arturo Gonzalez Jr. at the time of their first contact or at what point they knew or should have known;

12.    Whether Plaintiff was detained and/or arrested and if so, whether such detainment and/or arrest was reasonable and lawful and whether such detainment and/or arrest was justified by probable cause;

13.    Whether the use of force by each Officer Defendant was reasonable and lawful;

14.     Whether Defendant Carruesco failed to intervene and/or was an integral participant in the detention/arrest and/or the use of force;

15.     Whether the plaintiff was harmed as a result of any alleged detention, arrest, and/or use of force by Defendants and the nature and extent of any such injuries;

16.     Whether the conduct of each Officer Defendant was such as to warrant the imposition of punitive damages;

17.     Whether Defendant Officers are entitled to immunity under federal and/or state law; and

18.     Whether any of the other affirmative defenses raised by Defendants in their Answer to the Operative Complaint act to bar or limit liability and/or damages sought by Plaintiff in this action.

**E.     DISPUTED LEGAL ISSUES**

None

**F.     DISPUTED EVIDENTIARY ISSUES**

Both parties intend to file motions in limine regarding the evidence to be used at trial. Plaintiff intends to file motions on the following subjects:

1.     To exclude all information not known to the officers at the time of the incident, including all information about Plaintiff, information about Plaintiff's son that was not actually known to the officers at the time, and information subsequently discovered or events that took place subsequent to the incident;

2.     To exclude any reference to gangs or drugs;

3.     To exclude the 9-1-1 calls themselves, which the defendant officers did not hear prior to the beating;

4.     To exclude allegations that Plaintiff's son stated that "he was in possession of a grenade, a rocket launcher, five friends and an AK-47;"

5.     To preclude or limit testimony about officers' subjective states of mind, beliefs, or fears;

6.     To exclude references to Plaintiff's race, immigration status, or his neighborhood, including both direct and indirect appeals to prejudice, such as allegations that it is a "gang neighborhood" or a "high-crime area." As to Plaintiff's race, counsel agree that his race has no pertinence to the issues in the case. Likewise, because Plaintiff does not seek damages for lost wages,

counsel agree that his immigration status. Thus, the Court **ORDERS** that this evidence will not be allowed.[1]

> 7.     To exclude certain opinions of Defendants' police practices expert;

> 8.     To exclude certain opinions and testimony by Defendants' medical expert; and

> 9.     To address the qualified immunity and comparative negligence defenses, to establish how these defenses will (and will not) be handled at trial and in front of the jury. To the extent that qualified immunity is raised at trial, the immunity is a question of law for the Court and this defense will not be presented to the jury. If there are fact questions that must be determined by the jury before qualified immunity may be considered, either side may propose special interrogatories for the jury to decide. If they choose to do so, they SHALL file the special interrogatories to the jury at the same time as their verdict form (as set forth below).

## G.     SPECIAL FACTUAL INFORMATION

>     1.     Plaintiff's Special Factual Contentions:

*The date, place and general nature of the incident*: This is a civil rights and personal injury lawsuit involving a videotaped seizure and beating of Arturo Gonzalez by the defendant police officers. Plaintiff suffered serious injuries to his back and shoulder.

The officers claim that they charged, tackled, and beat Plaintiff based on the mistaken belief that Plaintiff was his son, who is also named Arturo Gonzalez. From Plaintiff's perspective, it was an unprovoked attack on an innocent disabled retiree who had come outside to try to help the officers and who had done nothing wrong. Plaintiff contends that the officers' alleged mistake as to his identity was not reasonable, since he wore a gray beard, since he was obviously not in his thirties, and since he told the officers who he was. The officers were told over the radio that Plaintiff's son was not home and that Plaintiff was stepping out of the house. Even if the person the officers encountered had been Plaintiff's son, there is no justification for attacking and beating a person who is cooperating and complying with all instructions. Plaintiff contends that the seizure and beating of Plaintiff violated

---

[1] However, counsel reported that Plaintiff speaks with an accent and, of course, his name implies that he is of Mexican descent. What is observable to the jury cannot be excluded, of course, but his ancestry has no bearing on the issues to be decided.

Plaintiff's rights under state and federal law. The incident took place at approximately 1:45-2:15 a.m. on January 20, 2015 near 4800 Chinta Drive in Bakersfield.

*The particular acts, omissions, and conditions constituting the basis for liability*: The officers admit that they were dispatched on a "check the welfare" call, which means, in Defendant Barrier's words: "Check the welfare is when there's an individual who appears to need assistance due to some type of either mental disability or physical disability or rambling and so forth." The officers were told that a person had called 9-1-1 and was "rambling incoherently and not making much sense." The officers did not actually hear the call. The caller's cellphone had been traced to an approximate latitude/longitude location.

The officers received information that the "subject should be identified as Arturo Gonzalez, 4-7-82," indicating a person who was in the area of 33 years old. The dispatched officers were also transmitted information to the effect: "Officer safety, this RP made 422 to ambush law enforcement past date," meaning that the caller had made past threats against the police (not on the night in question). No other information was dispatched to the officers about the caller.

The officers briefly stopped at a nearby location to discuss a "tactical plan." One possible outcome the officers considered was to take the caller into custody for the purposes of mental health treatment. Obviously, one reason why a person could call 9-1-1 and ramble is that the person is mentally ill, and the officers considered that possibility. The officers did not have any information that any specific crime had occurred (they merely planned to investigate to determine whether a crime had occurred). The officers did not have any information that anyone was in danger, other than possibly police officers or the caller. No crime was committed on the day of the prior 9-1-1 calls.

The officers' "tactical plan" consisted of the following: "It's to approach quietly. [Orozco] and Sergeant Carruesco would be on the south side and Barrier and Knott would be on the north side." That was the extent of the "tactical plan." There does not appear to have been any plan formulated for a situation where the subject surrendered or where an innocent third party exited the residence.

The officers traveled to the location from which they believed the call had been made, parked their vehicles along the street, and approached the house on foot. Barrier attempted to call the cellphone from which the 9-1-1 calls had been made, but nobody answered.

5

Then Barrier contacted the dispatcher to ask the dispatcher to call the land line at the house. The purpose of doing this was to have the dispatcher tell the person in the house to come outside. Barrier successfully made contact with the dispatcher and asked the dispatcher to call the residence and have someone come outside. Barrier stated, "Can you confirm the address and locate a telephone number for this subject?" The operator responded, "10-4."

The dispatcher then called the landline, and Plaintiff picked up the phone. Plaintiff has discovered a recording of that phone call. The time was approximately 1:47 in the morning, and Plaintiff was asleep. On the recording, the following can be heard:

| | |
|---|---|
| Plaintiff: | [Ringing] Hello. |
| Dispatcher: | Hello, is Arturo there? |
| Plaintiff: | Arturo who? |
| Dispatcher: | Arturo Gonzalez? |
| Plaintiff: | Senior? Yes. |
| Dispatcher: | I'm looking for Junior. |
| Plaintiff: | No, he's not in right now. |
| Dispatcher: | He's not in right now? |
| Plaintiff: | No. |
| Dispatcher: | Um, is this the address that called police recently, 4800 Chinta Drive? |
| Plaintiff: | Well, this is Arturo's father. And this is, um, 4800 Chinta Drive. |
| Dispatcher: | Mmk. Ok. Arturo called us. |
| Plaintiff: | Yes. |
| Dispatcher: | And he was stating that – Sir, there are officers outside, and they need somebody to come outside and talk to them. |
| Plaintiff: | Ok. |
| Dispatcher: | Can you go outside? |
| Plaintiff: | I – I can, yes. It's going to be a little bit. |
| Dispatcher: | All right. I'll let the officer know, ok? |
| Plaintiff: | Ok, fine. |
| Dispatcher: | Thank you sir. Bye-bye. |
| Plaintiff: | Bye. |

After having made contact with Plaintiff, the dispatcher sent the following audio transmission to Defendant Barrier: "5 North 1 [Barrier's call sign], I made contact with the subject's father. He's advising he's not there; however, he will step out and speak with police." In other words, the dispatcher told the officers that the person they were looking for was not at home but that the person's father (i.e., Plaintiff) would step outside and talk to them. Plaintiff has discovered the audio recording of this call as well as the written CAD (Computer Aided Dispatch) entry of this call. Plaintiff has also authenticated it

6

via the testimony of the dispatcher as well as of the City of Bakersfield's designee under Federal Rule of Civil Procedure 30(b)(6). The officers claim they never got the call.

After Plaintiff came outside, Plaintiff was instructed to walk backwards to the sound of the officer's voice. Plaintiff complied with these commands within seconds. Barrier conceded at his deposition that at that time, Plaintiff was submitting to his authority. When officers asked Plaintiff who he was, and he said, "This is Arturo Gonzalez Montes, sir." At that time, Plaintiff had a gray beard.

The rest of the encounter is captured on video (which is submitted herewith). Plaintiff is walking backwards with his hands above his head, complying with the officers' commands. Then he is ordered onto his knees, and he complies. The officers claim that at this point, Plaintiff "maneuvered his shoulder back and forth" in "a strange manner" and "reached for his waistband." However, Plaintiff disputes this version of events. Plaintiff merely lowers his right hand to touch the ground for balance as he goes down to his knees. Then the officers charge, tackle, and beat Plaintiff.

On the video, Defendant Barrier is the first to make contact with Plaintiff. Barrier admits to applying force with his knee, using a control hold, striking Plaintiff with his fist, and applying his body weight. Barrier admits that he struck Plaintiff as hard as he could with his knee. Barrier also admits that he punched Plaintiff in the face as hard as he could. Barrier also admits applying body weight to Plaintiff for 60 seconds.

Meanwhile, Defendant Orozco applied a control hold. Specifically, Defendant Orozco applied a rear wrist lock to twist one of Plaintiff's hands behind his back. Defendant Knott applied body weight to Plaintiff's back. The officers admit that Plaintiff never punched, kicked, or verbally threatened the officers. Defendant Barrier never believed that Plaintiff was trying to flee.

After he was in handcuffs, Plaintiff complained of pain. Orozco After taking Plaintiff into custody, the officers claim to have realized their mistake. When asked, Plaintiff told the officers that he had not seen or heard from his son, Arturo Gonzalez Jr., in two days.

No crime had been committed. However, even after Defendant Barrier was told that Plaintiff was not the person they were looking for, Defendant Barrier requested permission to arrest Plaintiff. Defendant Barrier's request for permission to arrest Plaintiff was denied.

Even though no crime had been committed and the officers knew that Plaintiff was not the person they had been looking for, Plaintiff remained in handcuffs. While in handcuffs, he was placed in the back of a patrol car (causing excruciating pain to his injured shoulder). The handcuffs were not unfastened from behind his back until around the time the paramedics arrived. Defendants acknowledge that the paramedics did not arrive until 2:09, or 22 minutes after Plaintiff was ordered out of his house. After the paramedics arrived, Plaintiff was handcuffed to the gurney. The handcuffs were not removed until Plaintiff arrived at the hospital.

*The particular acts, omissions or conditions constituting the basis of any defense*: Plaintiff contends that no defenses are available based on the facts and circumstances of the case.

*The age, injuries sustained, prior injuries, medical expenses and estimated future medical expenses of claimant*: Arturo Gonzalez, age 64, suffered severe and lasting injuries to his neck, lower back, and shoulders consisting, without limitation, of post traumatic tendinosis with tears in the left shoulder, post traumatic impingement syndrome in the left shoulder, post traumatic tendinosis and impingement syndrome in the right shoulder, post traumatic cervical disc derangement and disc prolapse, post traumatic lumbar disc derangement and disc prolapse with annular tears, headaches, 6th and 7th rib fractures, hip pain, knee pain, anxiety and chest pain. His injuries required hospitalization and long-term medical treatment. He continues to experience pain and discomfort throughout his entire body, and his injuries require ongoing medical care in the future, consisting, without limitation, of epidural steroid injections and medial branch nerve blocks in the spine, lumbar discogram, lumbar radio frequency ablation, and left shoulder surgical arthroscopy. Mr. Gonzalez has a history of low back pain, but prior to this incident it was stable and did not require any intervention. The past medical specials are $53,468.41. The future medical specials are as follows: $5,000 to $6,000 per injection for epidural steroid injections. He will likely need a total of six injections in the future. The estimated cost for the left shoulder arthroscopic surgery is $30,000 to $40,000. The estimated cost for the lumbar radio frequency ablation is $8,000 to $10,000 and he will likely require two of these in the future. The total estimated costs for future medical care are $76,000 to $96,000.

    2.    Defendant's Special Factual Contentions:

On January 20, 2015 at approximately 1:15 a.m., Bakersfield Police Officers Douglas Barrier,

Kasey Knott, Juan Orozco, and Sergeant Gary Carruesco were dispatched to 4800 Chinta Drive in Bakersfield, California to "check the welfare" of an individual who had made prior threats to kill law enforcement. Prior to their arrival, Bakersfield Police Officer Douglas Barrier was provided with additional details regarding the criminal threats and the suspect by the Bakersfield Communication Center. Officer Barrier was also advised that the subject's name was Arturo Gonzalez, his date of birth was April 7, 1982, and that there was an outstanding warrant for his arrest. In addition, Officer Barrier accessed information about prior calls for service at the Chinta Drive address including the fact that on January 18, 2015, Arturo Gonzalez made multiple calls saying things like "I got my shotgun and I'm gonna kill the cops!", that he was in possession of a 12 gauge shotgun and if Officers arrive at his residence, he will "be hiding in the dark to ambush" responding Officers, that he was in possession of a grenade, a rocket launcher, five friends and an AK-47. Officer Barrier also learned that Arturo Gonzalez had a prior arrest for assault with a deadly weapon in 2007 and criminal threats in 2009.

Prior to going to the residence, the four Officers parked and met at the intersection of Ambrister Drive and Stine Road to form a tactical plan. Officer Barrier relayed the information he had learned through his records check including providing information regarding the previous calls by Arturo Gonzalez Jr. regarding the threats to police officers, and the fact that Arturo Gonzalez Jr. had a warrant for his arrest.

The Officers proceeded to 4800 Chinta Drive on foot, utilizing vehicles for cover. Upon arrival, Officer Barrier attempted to call the cell phone number associated with the calls that had been made on January 18, 2015; however, no one answered. At that point, Officer Barrier contacted the Communications Center to ask if they would contact the reporting party and have the subject step outside the residence. Officer Barrier also asked if the Communication Center could attempt to locate a land-line associated with 4800 Chinta Drive and make contact.

At approximately 1:50 a.m., a male subject exited the residence wearing baggy clothing, a hooded sweatshirt and a beanie. Officer Barrier was concerned that the subject's hands were concealed. Officer Barrier proceeded to shine his flashlight on the male subject announcing "Bakersfield Police Department". Officer Barrier then called out: "Arturo Gonzalez, take your hands out of your pockets." Mr. Gonzalez acknowledged Officer Barrier and the Officers believed that the

make subject coming out of the residence was the subject they were looking for and who had made criminal threats regarding ambushing police.

The male subject initially said "okay" in response to the orders by Officer Barrier but then failed to immediately remove his hands from his pockets. The Officers remained fearful that the male subject was in possession of firearm in his pocket. When the male subject did finally remove his hands from his pocket, Officer Barrier ordered the male subject to put his hands in the air and walk back towards him. The male subject walked behind all of the vehicles down the driveway which caused the Officers significant concern. The male subject then turned around and while he initially put his hands in the air and started walking backwards, he kept dropping his hands down from a raised position down to shoulder level and kept turning back and looking over his right shoulder. This conduct led the Officers to believe that the male subject was attempting to pinpoint the Officers' location and was preparing for a gun fight.

Officer Barrier again ordered the male subject to place his hands higher in the air and to face forward. Officer Barrier gave additional and repeated commands to the male subject to re-raise his hands or to face forward, which the male subject did momentarily and then he would lower them down again or look back toward the Officers. This conduct was threatening to the Officers because a suspect could quickly reach for a weapon and use that weapon. Once the male subject had reached a well lit area underneath a light post, Officer Barrier ordered him to stop, keep his hands in the air, and to get down on his knees.

As the male subject went down to his knees, he maneuvered his right shoulder back again and dropped his hands toward his waistband. In addition, the male suspect moved his left shoulder back and forth, which seemed unusual to the Officers, who were concerned he was reaching for a weapon.

Officer Barrier yelled "stop" and ran toward the male subject with Officer Knott. Officer Barrier then attempted to grab the male subject's left forearm with his left hand and the male subject's right forearm with Officer Barrier's right hand. However, the male subject maneuvered his right shoulder back toward Officer Barrier. At that point, Officer Barrier used his momentum to push the male subject forward onto his stomach. Officer Barrier then attempted to place the male subject's hands behind his back; however, the male subject's left arm remained underneath him. Officer Barrier yelled

at the male subject to place his hands behind his back but the male subject refused to comply and would not move his left arm from underneath him. Officer Barrier was able to maintain control over the male subject's right arm and again yelled for the male subject to place his hands behind his back and to stop resisting. The male subject would not remove his left arm and did not comply.

At that point, while Officer Orozco took control over the male subject's right arm, the male subject rolled onto his left side causing Officer Barrier's left arm to be trapped underneath the male subject's body. Officer Barrier again yelled at the male subject to roll over flat on his stomach and place his arms behind his back; however, the male subject refused. Officer Barrier attempted to remove the male subject's arm from underneath him by pulling on it with his left arm. However, this resulted in the male subject rolling over onto his back, which exposed the officers to risk of being kicked. Officer Barrier maintained his grasp of the male subject's left arm and Officer Orozco maintained control over the male subject's right arm. Officer Barrier then utilized his right knee to knee the male subject in the left side, which allowed the officers to roll the male subject onto his stomach. At this point, Officer Barrier was able to secure the male subject's left arm near his head and then attempted to place the male subject's left arm behind his back so that he could be handcuffed. However, the male subject brought his arm close to his body causing Officer Barrier to believe the male subject would place his arm back underneath him. In order to prevent this, Officer Barrier punched the male subject one time on the left side of his face. Despite this, the male subject continued to resist. Officer Barrier again yelled at him to stop resisting and to just place his hands behind his back; however the male subject adjusted his body and tensed his arm. Officer Barrier placed his left knee on the male subject's left side and applied body weight for between 10-30 seconds. Officer Knott placed his hands on the male subject's upper back and pressed down using some of his body weight for between 10-30 seconds. Officer Barrier was then able to put the male subject in handcuffs.

After getting the male subject into handcuffs, the male subject informed the police Officers, for the first time, he was Arturo Gonzalez Montes and that Arturo Gonzalez Jr. was his son. This was the first time the Officers realized the person in custody was not Arturo Gonzalez Jr. He then complained to the Officer that he had pain in his shoulders, left side, and lower back and as such, an ambulance was summoned at 2:02 a.m. and arrived at 2:09 a.m. Mr. Gonzalez Montes was taken by ambulance to

Mercy Southwest Hospital. Plaintiff Arturo Gonzalez Montes was not placed under arrest.

Defendants maintain that their conduct in all aspects was reasonable and lawful. Specifically, regardless of whether the Plaintiff was Arturo Gonzalez Jr., or not, the threats that had been made were sufficient to put any officer on high alert in regard to anyone coming out of the house. Arturo Gonzalez Montes did not comply with police orders causing further concern of risk of harm and which necessitated the use of force, particularly given his active resistance. There was probable cause for his detention and the use of force was entirely justified and lawful. In the alternative, the Defendants are entitled to Qualified Immunity and/or immunity pursuant to California's Government Code. In addition, it is Defendants' position that the Plaintiff's conduct and the conduct of his son caused and/or contributed to this incident.

The Plaintiff claims ongoing orthopedic injuries, particularly to his back, shoulder, and neck. The Defendants deny that the Plaintiff suffered any injuries that were not resolved within days of the incident.

**H. RELIEF SOUGHT**

**Plaintiff**

a. All available categories of non-economic compensatory damages under federal and state law, including but not limited to physical pain, mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, and humiliation – both past and future;

b. Economic damages, including both past and future medical expenses;

c. Punitive damages;

d. Statutory damages under the Bane Act; and

e. Attorneys' fees and costs.

**Defendants**

Defendants seek dismissal of this case, costs, and attorneys' fees under 42 U.S.C § 1988 and 42 U.S.C § 1927, Federal Rule of Civil Procedure 54, Local Rules 292 and 293, and all other applicable statutes and rules.

**I. ABANDONED ISSUES**

During the course of this litigation, Plaintiff dismissed the following causes of action: (1)

Substantive Due Process (42 U.S.C § 1983) [third cause of action]; (2) Municipal Liability-Ratification (42 U.S.C § 1983) [fourth cause of action]; (3) Municipal Liability- Police of Inaction (42 U.S.C § 1983) [fifth cause of action]; (4) Municipal Liability- Unconstitutional Custom, Practice, or Policy (42 U.S.C § 1983) [sixth cause of action]; and (5) Cal. Civil Code § 52.1 (Bane Act) as to Defendant Gary Carruesco only. [See Dkt. Nos. 30, 42.]

**J.    WITNESSES**

The following is a list of witnesses that the parties expect to call at trial, including rebuttal and impeachment witnesses.  NO WITNESS, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE CALLED AT TRIAL UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 281(b)(10).

**Plaintiff's Witnesses**

1.    Plaintiff Arturo Gonzalez

2.    Defendant Douglas Barrier

3.    Defendant Kasey Knott

4.    Defendant Juan Orozco

5.    Defendant Gary Carruesco

6.    Natalie Collins

7.    Jaime Patterson

8.    Jerry Haroldsen

9.    Joseph Mullins

10.   Chris Hall

11.   Travus Falco

12.   Branden Campbell

13.   Scott DeFoe (Retained Expert)

14.   Richard Emmanuel, M.D. (Retained Expert)

15.   Luis Teopengco, M.D. (Non-retained Expert)

16.   Arturo Palencia (Non-retained Expert)

17. Kian Azimian, M.D., Mercy Hospital

18. Sarah Carr, PA-C, Mercy Hospital

19. Nelson Yang, M.D., Mercy Hospital

20. Waad Hanna, M.D. (radiology), Mercy Southwest

21. Robert Port, M.D., Clinica Sierra Vista

22. James Cusator, M.D., Clinica Sierra Vista

23. Loraine Ash, D.O., Clinica Sierra Vista

24. Bryce Sheffield,  P.T., Terrio Therapy & Fitness

25. Carmen Fischer, M.D., Pain Institute of Central California

26. Afaq Kazi, M.D., Pain Institute of Central California

27. Kiersten Melendez, PA-CA, Comprehensive Cardiovascular

28. Kuan-The Wu, M.D., Comprehensive Cardiovascular

29. Supratim Banerjee, M.D., Comprehensive Cardiovascular

30. Nasser Kahn, M.D., Comprehensive Cardiovascular

31. Manjul Shah, M.D., Bakersfield Upright MRI

32. Gabriel Gelves, D.O., Bakersfield Upright MRI

33. Karan Kapoor, M.D., Truxtun Radiology Medical Group

34. Mark Williams, M.D., Truxtun Radiology Medical Group

35. Girish Patel, M.D., Truxtun Radiology Medical Group

36. Sonia Alvarenga

37. Pablo Alvarenga

**Defendants' Witnesses**

1. Plaintiff Arturo Gonzalez

2. Arturo Gonzalez Jr.

3. Carlo Gonzalez

4. Defendant Douglas Barrier

5. Defendant Kasey Knott

6. Defendant Juan Orozco

14

1      7.      Defendant Gary Carruesco

2      8.      Natalie Collins

3      9.      Jaime Patterson

4      10.      Jerry Haroldsen

5      11.      Custodian of Records - Department of Social Security/Office of Social Security

6      12.      Joseph Mullins

7      13.      Chris Hall

8      14.      Travus Falco

9      15.      Branden Campbell

10      16.      Curtis Cope (Retained Expert)

11      17.      Donald Huene M.D (Retained Expert)

12      18.      Nelson Yang, M.D (Non-Retained Expert)

13      19.      Waad Hanna, M.D (Non-Retained Expert)

14 **K.**      **EXHIBITS, SCHEDULES AND SUMMARIES**

15      The following is a list of documents or other exhibits that the parties expect to offer at trial.

16 NO EXHIBIT, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE ADMITTED

17 UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE

18 MODIFIED TO PREVENT "MANIFEST INJUSTICE." Fed. R. Civ. P. 16(e); Local Rule 281(b)(11).

19      **<u>Plaintiffs' Exhibits</u>**

20      *Liability Exhibits*:

21      1.      Surveillance Video

22      2.      Photographs of Plaintiff

23      3.      Dispatch Log (CAD Call Hardcopy)

24      4.      Dispatch Audio

25      5.      Dispatcher Call Audio

26      6.      Use of Force Report

27      7.      Master Audio Log

28      8.      Police Report Regarding Incident

9. Excerpts of BPD Policy Manual

10. Excerpts of POST Learning Domains

11. Excerpts of Training Records for Defendant Barrier

12. Excerpts of Training Records for Defendant Orozco

13. Excerpts of Training Records for Defendant Knott

14. Excerpts of Training Records for Defendant Carruesco

15. Audio of IME

16. Police Reports re Prior Calls

17. Excerpts from Cope File

*Medical Records*:

1. Medical records from Mercy Hospital

2. Medical records from Clinica Sierra Vista

3. Medical records from Terrio Therapy

4. Medical records from Pain Institute of Central California

5. Medical records from Comprehensive Cardiovascular Medical Group

6. Medical records from Bakersfield Memorial Hospital

7. Medical records from Stockdale Surgery Center

8. Medical records from Hall Ambulance

9. Medical records from Bakersfield Upright MRI

10. Medical records from Truxtun Radiology

*Medical Bills*:

1. Medical bills from Mercy Southwest

2. Medical bills from Pinnacle Emergency Physicians of Bakersfield

3. Medical bills from Kern Radiology Medical Group

4. Medical bills from Clinica Sierra Vista

5. Medical bills from Terrio Therapy Fitness

6. Medical bills from Pain Institute of Central California

7. Medical bills from Comprehensive Cardiovascular Medical Group

8.   Medical bills from Bakersfield Memorial Hospital

9.   Medical bills from Stockdale Surgery Center, LLC

10.   Medical bills from Hall Ambulance

11.   Medical bills from Bakersfield Upright MRI

12.   Medical bills from Truxtun Radiology Medical Group

**Defendants' Exhibits**

1.   Records from the Department of Social Security/Office of Social Security

2.   911 calls made by Arturo Gonzalez Jr.

3.   Photographs of Plaintiff

4.   Surveillance Video of Plaintiff

5.   Video of Plaintiff's deposition

6.   911 Calls made by Carlo Gonzalez

7.   Select records from Mercy Hospital

8.   Select records from Hall Ambulance

9.   Police Reports associated with 4800 Chinta Drive

10.   Police Report GO# 2015-14237

11.   Select xrays, CT scans, and/or MRIs taken of Plaintiff

12.   Select records from Bakersfield Memorial Hospital

12.   Excerpts from Cope File

13.   Excerpts from Huene File

14.   Photographs of Scene

On or before **July 14, 2017** counsel **SHALL** meet and confer to discuss any disputes related to the above listed exhibits and to pre-mark and examining each other's exhibits.   Any exhibits not previously disclosed in discovery **SHALL** be provided via e-mail or overnight delivery so that it is received by **July 10, 2017**.

1.   At the exhibit conference, counsel will determine whether there are objections to the admission of each of the exhibits and will prepare separate indexes; one listing joint exhibits, one listing Plaintiff's exhibits and one listing Defendant's exhibits.  In advance of the conference, counsel

must have a complete set of their proposed exhibits in order to be able to fully discuss whether evidentiary objections exist.  Thus, any exhibit not previously provided in discovery **SHALL** be provided at least five court days in advance of the exhibit conference.

2.      At the conference, counsel shall identify any duplicate exhibits, i.e., any document which both sides desire to introduce into evidence.  These exhibits **SHALL** be marked as a joint exhibit and numbered as directed above.  Joint exhibits **SHALL** be admitted into without further foundation.

All Joint exhibits will be pre-marked with numbers preceded by the designation "JT" (e.g. JT/1, JT/2, etc.).  Plaintiff's exhibits will be pre-marked with numbers beginning with 1 by the designation PX (e.g. PX1, PX2, etc.). Defendant's exhibits will be pre-marked with numbers beginning with 501 preceded by the designation DX (e.g. DX501, DX502, etc.). The parties SHALL number each page of any exhibit exceeding one page in length (e.g. PX1-1, PX1-2, PX1-3, etc.).

If originals of exhibits are unavailable, the parties may substitute legible copies. If any document is offered that is not fully legible, the Court may exclude it from evidence.

Each joint exhibit binder shall contain an index which is placed in the binder before the exhibits.  The index shall consist of a column for the exhibit number, one for a description of the exhibit and one column entitled "Admitted in Evidence" (as shown in the example below).

**INDEX OF EXHIBITS**

| | | **ADMITTED** |
|---|---|---|
| **EXHIBIT#** | **DESCRIPTION** | **IN EVIDENCE** |

3.      As to any exhibit which is not a joint exhibit but to which there is no objection to its introduction, the exhibit will likewise be appropriately marked, i.e., as PX1, or as DX501 and will be indexed as such on the index of the offering party.   Such exhibits will be admitted upon introduction and motion of the party, without further foundation.

4.      Each exhibit binder shall contain an index which is placed in the binder before the exhibits.   Each index shall consist of the exhibit number, the description of the exhibit and the three columns as shown in the example below.

**INDEX OF EXHIBITS**

| **ADMITTED** | **OBJECTION** | **OTHER** |
|---|---|---|

18

EXHIBIT#     DESCRIPTION      IN EVIDENCE      FOUNDATION      OBJECTION

5.      On the index, as to exhibits to which the only objection is a lack of foundation, counsel will place a mark under the column heading entitled "Admissible but for Foundation."

6.      On the index, as to exhibits to which there are objections to admissibility that are not based solely on a lack of foundation, counsel will place a mark under the column heading entitled "Other Objections."

After the exhibit conference, Plaintiff and counsel for the defendants **SHALL** develop four complete, legible sets of exhibits.  The parties **SHALL** deliver three sets of their exhibit binders to the Courtroom Clerk and provide one set to their opponent, no later than 4:00 p.m., on **August 18, 2017** Counsel **SHALL** determine which of them will also provide three sets of the joint exhibits to the Courtroom Clerk.

7.      The Parties **SHALL** number each page of any exhibit exceeding one page in length.

///

**L.**     **DISCOVERY DOCUMENTS**

The following is a list of discovery documents – portions of depositions, answers to interrogatories, and responses to requests for admissions – that the parties expect to offer at trial. NO DISCOVERY DOCUMENT, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE ADMITTED UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 281(b)(12).

**Plaintiff's Documents**

1.      City's Responses to Request for Admissions, Set One, served June 20, 2016

2.      City's Responses to Special Interrogatories, Set One, served June 20, 2016

3.      City's Responses to Request for Production, Set One, served June 29, 2016

4.      City's Supplemental Responses to Request for Production, Set One, served August 22, 2016

5.      City's Responses to Request for Production, Set Two, served September 6, 2016

6.      City's response to Request for Production, Set Three, served November 16, 2016

**Defendants' Documents**

1.    Plaintiffs' Responses to Special Interrogatories from Douglas Barrier

2.    Plaintiffs' Responses to Special Interrogatories from Gary Carruesco

3.    Plaintiffs' Responses to Special Interrogatories from City of Bakersfield

4.    Plaintiff's Responses to Requests for Production of Documents Set No. 1

5.    Plaintiff's Responses to Requests for Production of Documents Set No. 2

In the event the parties wish to admit any portion of a discovery document, the specific discovery request, e.g., interrogatory, request for admission, must be redacted so that any extraneous request/response is omitted.

**M.    FURTHER DISCOVERY OR MOTIONS**

No further discovery is sought by either party.

**N.    MOTIONS IN LIMINE**

Any party may file motions in limine.  The purpose of a motion in limine is to establish in advance of the trial that certain evidence should not be offered at trial.  "Although the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials."  Luce v. United States, 469 U.S. 38, 40 n. 2 (1984); Jonasson v. Lutheran Child and Family Services, 115 F. 3d 436, 440 (7th Cir. 1997). The Court will grant a motion in limine, and thereby bar use of the evidence in question, only if the moving party establishes that the evidence clearly is not admissible for any valid purpose.  Id.

**In advance of filing any motion in limine, counsel SHALL meet and confer to determine whether they can resolve any disputes and avoid filing motions in limine.  Along with their motions in limine, the parties SHALL file a certification demonstrating counsel have in good faith met and conferred and attempted to resolve the dispute.  Failure to provide the certification may result in the Court refusing to entertain the motion.**

Any motions in limine must be filed with the Court by **July 28, 2017**.  The motion must clearly identify the nature of the evidence that the moving party seeks to prohibit the other side from offering at trial. Any opposition to the motion must be served on the other party, and filed with the Court by **August 4, 2017**. The Court sets a hearing on the motions in limine on **August 14, 2017**, at 9:30 a.m.

Counsel may appear via teleconference by dialing (888) 557-8511 and entering Access Code 1652736, provided the Magistrate Judge's Courtroom Deputy Clerk receives a written notice of the intent to appear telephonically no later than five court days before the noticed hearing date.

The parties are reminded they may still object to the introduction of evidence during trial.

**O.  STIPULATIONS**

None.

**P.  AMENDMENTS/ DISMISSALS**

The parties stipulate to the dismissal of the "Doe Defendants" identified in the operative Complaint.  (*See* Doc. 49 at 32)

**Q.  SETTLEMENT NEGOTIATIONS**

The parties report that they "engaged in a formal mediation which did not lead to the resolution of this matter."  (Doc. 49 at 32)

**R.  AGREED STATEMENT**

None.

**S.  SEPARATE TRIAL OF ISSUES**

None.

**T.  APPOINTMENT OF IMPARTIAL EXPERTS**

None requested

**U.  ATTORNEYS' FEES**

The parties will seek an award of attorneys' fees as appropriate as a post-trial motion.

**V.  TRIAL DATE/ ESTIMATED LENGTH OF TRIAL**

Jury trial is set for **August 21, 2017**, at 8:30 a.m. before the Honorable Jennifer L. Thurston at the United States Courthouse, 510 19th Street, Bakersfield, California. Trial is expected to last 5-7 days.

**W.  TRIAL PREPARATION AND SUBMISSIONS**

**1.  Trial Briefs**

The parties are relieved of their obligation under Local Rule 285 to file trial briefs. If any party wishes to file a trial brief, they must do so in accordance with Local Rule 285 and be filed on or before **August 11, 2017**.

**2. Jury Voir Dire**

The parties are required to file their proposed voir dire questions, in accordance with Local Rule 162.1, on or before **August 11, 2017.**

**3. Jury Instructions & Verdict Form**

The parties shall serve, via e-mail or fax, their proposed jury instructions in accordance with Local Rule 163 and their proposed verdict form on one another no later than **July 28, 2017.** The parties shall conduct a conference to address their proposed jury instructions and verdict form no later than **August 4, 2017**. At the conference, the parties **SHALL** attempt to reach agreement on jury instructions and verdict form for use at trial. The parties shall file all agreed-upon jury instructions and verdict form no later than **August 11, 2017**, and identify such as the agreed-upon jury instructions and verdict forms. At the same time, the parties **SHALL** lodge via e-mail a copy of the joint jury instructions and joint verdict form (in Word format) to JLTOrders@caed.uscourts.gov.

**If and only if, the parties after genuine, reasonable and good faith effort** cannot agree upon certain specific jury instructions and verdict form, the parties shall file their respective proposed (disputed) jury instructions and proposed (disputed) verdict form no later than **August 11, 2017,** and identify such as the disputed jury instructions and verdict forms. At the same time, the parties **SHALL** lodge via e-mail, a copy of his/their own (disputed) jury instructions and proposed (disputed) verdict form (in Word format) to JLTOrders@caed.uscourts.gov.

In selecting proposed instructions, the parties shall use Ninth Circuit Model Civil Jury Instructions or California's CACI instructions to the extent possible. All jury instructions and verdict forms shall indicate the party submitting the instruction or verdict form (i.e., joint, plaintiff's, defendant's, etc.), the number of the proposed instruction in sequence, a brief title for the instruction describing the subject matter, the **complete** text of the instruction, and the legal authority supporting the instruction. Each instruction **SHALL** be numbered.

**X. OBJECTIONS TO PRETRIAL ORDER**

Any party may, within 10 days after the date of service of this order, file and serve written objections to any of the provisions set forth in this order. Such objections shall clearly specify the requested modifications, corrections, additions or deletions.

**Y.    MISCELLANEOUS MATTERS**

None.

**Z.    COMPLIANCE**

Strict compliance with this order and its requirements is mandatory.  All parties and their counsel are subject to sanctions, including dismissal or entry of default, for failure to fully comply with this order and its requirements.

IT IS SO ORDERED.

Dated:   **July 5, 2017**                             **/s/ Jennifer L. Thurston**
                                                                    UNITED STATES MAGISTRATE JUDGE